STATE of North Dakota, Plaintiff
and Appellee,

v.

Scot A. HAUGEN, Defendant
and Appellant.

Crim. No. 890306.

Supreme Court of North Dakota.

July 3, 1990.

Wayne D. Goter, Asst. State's Atty., Mandan, for plaintiff and appellee.

Deborah J. Carpenter of the Carpenter Law Offices, Bismarck, for defendant and appellant.

VANDE WALLE, Justice.

Scot A. Haugen appealed from a district court judgment finding him guilty of one count of burglary. We affirm.

Lynn Helferich was the owner and operator of the Tree City Bar in Mandan, North Dakota. She had known Scot Haugen through his ex-wife, Angela Serr, for approximately three years. During the week prior to December 5, 1988, Haugen came to Helferich with a plan to steal money from a charitable gaming site operated by the North Dakota chapter of the American Bikers Aiming Toward Education (ABATE). ABATE's gaming site was located inside the Tree City Bar. Haugen suggested to Helferich that the plan would be a good way to make money for the both of them, and indicated that he would commit the crime with or without her help.

Helferich did not give Haugen a reply to the proposed theft but, after their conversation, she immediately contacted the Mandan Police Department to inform them of Haugen's plan. Deputy Chief Dennis Bullinger instructed Helferich not to assist Haugen in committing the criminal offense and to try to dissuade him from pursuing the crime. Deputy Chief Bullinger also asked Helferich to contact him each time she had conversations with or learned anything from Haugen or Angela Serr. Helferich agreed to cooperate fully with the Mandan police, and the police made her aware that they would contact ABATE about the possible theft. Helferich also informed her insurance agent of the situation.[1]

During subsequent telephone conversations, Helferich told Haugen that she did not want him to carry out the proposed crime, and that she did not want him on the premises of the bar. On December 5, 1988, Angela Serr requested, and Helferich loaned Serr, the keys to her car. Helferich surmised that the keys would wind up in Haugen's possession. The car keys were on a ring which contained between fifteen and twenty other keys, including the key to the door of the Tree City Bar. Shortly thereafter, Helferich received a telephone call from Haugen in which he asked what a number of the keys were for, although he did not specifically inquire as to the Tree City Bar key. Helferich believed that Haugen was going to make a copy of the bar key. After Serr returned the keys, Helferich contacted Deputy Chief Bullinger to inform him of Haugen's access to the keys and of her belief that the door key to the bar was in Haugen's possession.[2]

That evening, Deputy Chief Bullinger assigned Detective Ray Hoff to conduct a surveillance of the Tree City Bar. Detective Hoff set up his surveillance in a lumber yard across the street from the bar. At approximately 2:49 a.m. on April 6, 1988, Detective Hoff observed Haugen walk up to the front door of the bar, open it with a key, and enter into the premises. Hoff immediately requested units on patrol to assist in securing the front and rear doors of the bar. Once the entrances were secured, Detective Hoff attempted to enter the bar through the front door. When it was discovered that the door had been locked, the officers telephoned Helferich to supply them with a key. Upon entering the bar, the officers found Haugen hiding in a cooler and arrested him.

During his investigation, Detective Hoff noticed fresh pry marks around the hasp and lock that secured the money at ABATE's gaming table in the bar. However, a subsequent search of the bar for tools used to pry at the lock and hasp proved unfruitful.

Richard Helbling, a bartender employed at the Tree City Bar, closed the bar shortly after 1:00 a.m. and was the last person to

---

1. The agent eventually notified Helferich that the bar's insurance policy would not cover any broken glass incurred by the front door.

2. During trial, Helferich explained that although she suspected her keys would eventually wind up in Haugen's possession when she loaned them to Serr, she gave the keys to Serr because Haugen had threatened to commit the crime with or without her help and she didn't want to bear the expense of having her bar extensively damaged. Helferich also stated that she was tired of the stress of conducting her own night watches over the bar, and that she believed that the police would take care of the matter.

leave it early on the morning of December sixth. Shari Keller, the manager of the gaming site, noticed that the lock and hasp on ABATE's gaming table were not damaged in any fashion when she locked it up at 1:00 that morning.

At approximately 6:00 in the morning on December sixth, Helbling and Helferich went to the Tree City Bar to inspect it for any damage. During the inspection, they found a flashlight and tire iron hidden near the gaming table. The items were turned over to the police.

Haugen was charged with one count of burglary, a class C felony, in violation of NDCC § 12.1–22–02.[3] A jury returned a guilty verdict against Haugen and he appealed.

Although Haugen raised a number of issues on appeal, the only issues with merit are whether the trial court abused its discretion in limiting the cross-examination of Helferich concerning her business and personal financial condition because such evidence would be irrelevant; and whether the trial court's response to the jury's question regarding the definition of "otherwise privileged to enter the premises" was proper. We consider Haugen's arguments separately.

### FINANCIAL CONDITION

During the cross-examination of Lynn Helferich, counsel for Haugen inquired into the financial condition of the Tree City Bar and whether it had difficulty meeting expenses. Helferich responded that the bar was self-supporting and that it had no problem meeting expenses. During Helferich's response, the State objected to the question on the grounds of relevancy. Outside of the jury's presence, Haugen's counsel pointed out to the trial court that while Helferich testified to the fact that "she did not go along with [Haugen's] proposal" to steal money from the gaming tables, she loaned out her keys anyway knowing that they would wind up in Haugen's possession. Haugen's counsel asserted that evidence of the bar's poor financial condition would have been relevant to demonstrate a motive for Helferich to assist Haugen in the commission of the offense and that Haugen would, therefore, be invited or otherwise privileged to be on the premises. Counsel for Haugen made no offer of proof to the trial court to show that the bar was actually in financial straits. The trial court subsequently sustained the State's objection on relevancy grounds, but also noted that the objection would be sustained "if not strictly on relevancy, at least on Rule 403 [NDREv] because we are not getting into ... financial condition...." Upon resuming cross-examination, Haugen's counsel questioned Helferich regarding her personal financial condition. The State again objected to the question as both irrelevant and prejudicial under Rule 403, NDREv. The trial court sustained the State's objection.

Rule 402, NDREv, provides that "[a]ll relevant evidence is admissible," while "[e]vidence which is not relevant is not admissible." "Relevant evidence" is defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *See* Rule 401, NDREv; *State v. Haugen*, 448 N.W.2d 191 (N.D.1989); *State v. Huwe*, 413 N.W.2d 350 (N.D.1987). Thus, the test as to whether evidence is relevant or irrelevant is whether or not it tends to prove or disprove a fact in issue. *See Haugen, supra; State v. Erdman*, 422 N.W.2d 808 (N.D.1988). Even when evidence is found to be relevant, that evidence may still be excluded by the trial court under Rule 403, NDREv, "if its probative value is substantially outweighed by the danger of unfair

---

3. Section 12.1–22–02(1), NDCC, defines the offense of burglary as follows:

"A person is guilty of burglary if he willfully enters or surreptitiously remains in a building or occupied structure, or a separately secured or occupied portion thereof, when at the time the premises are not open to the public and the actor is not licensed, invited, or otherwise privileged to enter or remain as the case may be, with intent to commit a crime therein."

prejudice...." *See Haugen, supra; Huwe, supra.*

■ The right to confront witnesses is of constitutional magnitude [U.S. Const. amend. VI; N.D. Const. art. I, § 12; *State v. Buckley,* 325 N.W.2d 169 (N.D.1982)] and defense counsel is given wide latitude in cross-examining prosecution witnesses. *State v. Bartkowski,* 290 N.W.2d 218 (N.D. 1980). Nevertheless, the latitude and extent of cross-examination has always been held to be within the trial court's reasonable discretion. *Id.* The determination of whether or not evidence is relevant, and the balancing of the evidence's probative value against its prejudicial effect are also matters for the trial court to resolve in the exercise of its sound discretion. *See Huwe, supra; State v. Schimmel,* 409 N.W.2d 335 (N.D.1987); *State v. Kringstad,* 353 N.W.2d 302 (N.D.1984). On appeal, we will not overturn a trial court's decision regarding the admission or exclusion of evidence on the ground of relevancy unless the trial court abused its discretion. *See Haugen, supra; State v. Newnam,* 409 N.W.2d 79 (N.D.1987); *State v. Olson,* 290 N.W.2d 664 (N.D.1980). A trial court abuses its discretion when it acts in an arbitrary, unconscionable, or unreasonable manner. *State v. Kunkel,* 452 N.W.2d 337 (N.D. 1990); *State v. Erban,* 429 N.W.2d 408 (N.D.1988).

■ Ordinarily, "[e]vidence of poverty, dependence on welfare or unemployment is not admissible to show motive or as evidence of a witness's credibility." *People v. Conte,* 152 Mich.App. 8, 14, 391 N.W.2d 763, 766 (1986). This principle stems from the belief that if impecuniosity were allowed to be admitted as relevant evidence to show a witness's motive or credibility, indigent defendants in criminal cases would immediately be placed under unfair suspicion and disadvantage. *See United States v. Reed,* 700 F.2d 638 (11th Cir.1983); *State v. Moore,* 221 Neb. 706, 380 N.W.2d 288 (1986); *People v. Buggs,* 109 A.D.2d 1052, 487 N.Y.S.2d 202 (1985); *People v. Spencer,* 130 Mich.App. 527, 343 N.W.2d 607 (1983); *People v. Hogan,* 31 Cal.3d 815, 183 Cal.Rptr. 817, 647 P.2d 93 (1982). *See generally* 1 B. Jones, *Evidence* § 4:47 (6th ed. 1972) [evidence of a party's financial circumstances is generally not relevant in civil actions as well as criminal actions, and evidence of a criminal defendant's financial condition is ordinarily not admissible because it would place poor individuals under unfair suspicion]; 2 J. Wigmore, *Evidence* § 392 (1979) [while defendant's lack of money may have some relevancy to show a motive to commit a crime, the practical result of such a doctrine would be to put a poor person under so much suspicion that for reasons of fairness such arguments have seldom been countenanced as evidence]. Although the problems of financial condition usually arise from prosecutorial evidence of a criminal defendant's poverty, references by defense counsel as to the financial status of the victim may also be improper and prejudicial. *Cf.* Rule 403, Rule 611(a), NDREv [the court shall exercise reasonable control over mode or interrogating witnesses so as to protect witness from harassment or undue embarrassment].

■ As we observed in *State v. Bartkowski, supra,* 290 N.W.2d at 219: "[a]lthough we probably would not have limited the cross-examination in the manner that the trial court did, that is not the standard we apply in our review. Ordinarily it is preferable that trial courts permit overextended cross-examination rather than imposing limitations which may be unnecessary.... Some courts have expressed the view that doubts should be resolved on the side of liberality in allowing cross-examination." Nevertheless, as we explain below, we conclude that the trial court, if it erred in limiting Haugen's cross-examination of Helferich as to her financial condition, did not commit reversible error. Rule 52(a), NDRCrimP.

The testimony of the Mandan police officers and Helferich demonstrated that after Helferich had learned of Haugen's plan, she immediately contacted and fully cooperated with law enforcement authorities. The testimony further indicated that Helferich consulted with Deputy Chief Bullinger whenever she had contact with Haugen or

Serr, and that she tried to dissuade Haugen from committing the crime during phone conversations. Although Helferich loaned her car keys to Serr with a suspicion that the key ring would eventually wind up in Haugen's possession, she testified that Haugen had threatened to commit the crime with or without her help and that she did not want to bear the expense of having the bar extensively damaged. More importantly, Haugen did not make any offer of proof, whatsoever, to the trial court to demonstrate that the bar was in poor financial condition in order to support his "Helferich motive" theory. *State v. Buckley, supra.* Thus, in view of Helferich's statement that the bar was self-supporting and had no trouble meeting expenses, the absence of an offer of proof, and in light of all of the testimony of Helferich's full cooperation with police, there was no reversible error in limiting Haugen's cross-examination concerning the financial condition of the Tree City Bar and Helferich. Haugen introduced no evidence to show participation by Helferich in the crime due to financial stress and, under the circumstances of this case, the questions regarding the financial condition of Helferich and her business could only act to unfairly prejudice or impeach her testimony. *Cf. People v. Conte, supra;* Rule 611(a), NDREv.

## COURT'S RESPONSE TO JURY QUESTION

The trial court submitted instructions to the jury which explained the offense of burglary and its essential elements. One of the elements of the offense of burglary is that accused not be "licensed," "invited," or "otherwise privileged" to enter or remain in the building or occupied structure. NDCC § 12.1–22–02(1). During their deliberations, the jury asked the trial court for the definition of "otherwise privileged." The trial court responded that "[o]therwise privileged means having some legal right to enter the premises." Haugen's only objection to the definition pertained to the trial court's use of the word "legal" to describe the right to enter the premises. Haugen contends that the language used by the court was too restrictive, and that

the absence of the word "legal" would have allowed the jury to determine that Helferich had permitted his presence on the premises.

It has been well established that "jury instructions must correctly and adequately inform the jury of the applicable law and must not mislead or confuse the jury." *State v. Saul,* 434 N.W.2d 572, 576 (N.D.1989). Jury instructions must be considered as a whole and if, when so considered, they correctly advise the jury as to the law, they are sufficient, even though part of the instructions standing alone may be insufficient or erroneous. *State v. Raywalt,* 444 N.W.2d 688 (N.D.1989); *State v. Rott,* 380 N.W.2d 325 (N.D.1986); *State v. Halvorson,* 346 N.W.2d 704 (N.D.1984). If a jury instruction, when read as a whole, is erroneous, relates to a central subject of the case, and affects the substantial rights of the accused, it is a ground for reversal. *State v. Raywalt, supra; State v. White,* 390 N.W.2d 43 (N.D.1986); *State v. Bonner,* 361 N.W.2d 605 (N.D.1985).

The word "privilege" has been defined as a *"right,"* "power," or "immunity" held by a person. [Emphasis added.] *See* Black's Law Dictionary 1077 (5th ed. 1979). In the instant case, it is apparent that the trial court followed a similar definition when it instructed the jury that "privilege" meant "some legal right to enter the premises." A person who has no legal right to be in the premises would not be "privileged" to be there.

Nevertheless, while the definition in Black's Law Dictionary provides some insight, courts in states with burglary statutes similar to North Dakota have fleshed out the common-law meaning of when a person is "privileged" to enter another person's premises. These courts have held that:

"[A] person is 'privileged,' within the meaning of a burglary statute, if he may naturally be expected to be on the premises often and in the natural course of his duties or habits. . . . Further, a person who *is* privileged may still commit a burglary if he enters at a time when he

would not reasonably be expected to be present or if he goes into a room as to which his privilege does not extend." [Emphasis in original.] *Commonwealth v. Corbin*, 300 Pa.Super. 218, 223, 446 A.2d 308, 311 (1982); *State v. Thaxton*, 120 N.H. 526, 528, 419 A.2d 392, 393 (1980).

*See also* 33A Words and Phrases, *Privileged* 117 (Supp.1989). We approve of the definition of the term "privileged" as set forth in *Corbin* and *Thaxton*, and accordingly recommend that definition for purposes of future burglary instructions. However, we do not believe that the definition of "privileged" submitted to the jury by the trial court in this case was necessarily erroneous and misleading so as to cause prejudice to the substantial rights of Haugen. Both the trial court's definition of "privileged," and the version which we currently adopt from *Corbin* and *Thaxton*, connote some legitimate or natural purpose for entering the premises of another. The trial court's instruction, taken as a whole, was not prejudicial.

The judgment of the district court is affirmed.

ERICKSTAD, C.J., and GIERKE and LEVINE, JJ., concur.

MESCHKE, Justice, concurring.

I concur that the trial court's error in limiting Haugen's cross-examination of Helferich was harmless under NDRCrimP 52(a). I write separately to emphasize the constitutional importance of cross-examination for an accused and to stress the function of motive in assessing credibility of a witness.

The Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him." *State v. Reinart*, 440 N.W.2d 503, 506 (N.D.1989); *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The confrontation clause secures the accused's right of cross-examination. *State v. Hilling*, 219 N.W.2d 164, 171 (N.D.1974); *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). *Davis v. Alaska*, 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) explained:

A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. *Greene v. McElroy*, 360 U.S. 474, 496 [79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377] (1959). (Footnote omitted).

Any question, even an irrelevant or remote one, may be asked on cross-examination if it reasonably tends to discredit the testimony of a witness. 81 Am.Jur.2d *Witnesses* § 476 (1976). In particular, great latitude must be allowed to test the testimony of someone in the position of an accomplice. *State v. Kent*, 62 N.W. 631, 638–39 (N.D. 1895); 81 Am.Jur.2d *Witnesses* § 498 (1976). A trial court must allow ample scope in cross-examination of prosecution witnesses in a criminal defense.

Cross-examination of Helferich was central to Haugen's defense because Helferich was the prosecution's chief witness. While she was not charged as an accomplice, the reason for Helferich's complicity in staging of the burglary was a natural focus of her credibility. Defense counsel should have been allowed a loose rein in probing her motives.

The financial circumstances of either a defendant or a witness in a criminal case may often be irrelevant, prejudicial, or both. Nonetheless, it is axiomatic that a pecuniary interest of a witness can be used to show bias, prejudice, interest, or motive and to affect credibility. 81 Am.Jur.2d *Witnesses* § 663 (1976); *State v. Eggl*, 53 N.D. 520, 206 N.W. 784 (1925). To illustrate, financial motivation of the accused is

often important in arson and murder prosecutions. *See* 5 Am.Jur.2d *Arson and Related Offenses* § 53 (1962); 40 Am.Jur.2d *Homicide* § 280 (1968). Financial motivation of a witness can be equally important to a defense. "Sauce for the goose is sauce for the gander." I do not agree that the financial condition of a witness is rarely relevant to credibility of that witness.

For the reasons given in the majority opinion, I reluctantly conclude, in this case, that the trial court's restrictions on cross-examination of Helferich were harmless errors.